**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0633n.06
Filed: August 24, 2006

**No. 05-3876**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| THARO SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| cab PRODUKTTECHNIK GmbH & CO. KG, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

Before: DAUGHTREY and COOK, Circuit Judges; and COLLIER, District Judge.[*]

COOK, Circuit Judge. After finding that Defendant cab Produkttechnik GmbH & Co. Kg ("cab") breached its contract with Plaintiff Tharo Systems, Inc. ("Tharo"), a jury awarded over €6 million (Euros) in damages to Tharo. cab filed several post-judgment motions, seeking, among other things, judgment as a matter of law, a new trial, and remittitur. The magistrate judge[1] granted remittitur and reduced the damage award, which Tharo accepted, and also granted Tharo's motion

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

[1]The parties consented to having a magistrate judge conduct the proceedings in the case, including the trial. *See* 28 U.S.C. §636(c); Fed. R. Civ. P. 73. This opinion uses the terms "magistrate judge" and "trial court" interchangeably.

for prejudgment interest. cab now appeals asserting various grounds for reversal. With the exception of one issue that the parties agree requires a remand, we affirm.

I.

Tharo, an Ohio corporation, develops software for printing computerized bar code labels and sells and services special printers designed to print the labels and affix them to products. cab, a German corporation, manufactures the printers and label applicators. The parties' commercial relationship started in the mid-1980s and continued through 2003. In the 1990s, the parties explored the possibility of a joint venture aimed at designing and building their own label-printing system to be marketed worldwide. Negotiations culminated in 1996 with the signing of a Letter of Understanding ("LOU") intended to allow the parties "to work together . . . to become independent of other manufacturers." The LOU referred to the parties' relationship as the "CTC partnership."

Some eight years later, Tharo terminated the LOU after learning that cab intended to establish its own distribution networks in the U.S., in violation of the LOU, and had not been providing Tharo with "preferred pricing." In accordance with the LOU (Point 10), Tharo requested that cab provide Tharo with "full information" to enable Tharo to continue selling products following the partnership's dissolution. Specifically, Tharo requested "printer and board schematics, and firmware source code[s]" for several lines of printers. In its written response, cab asserted that: the LOU did not represent a contract; it never acted contrary to the LOU; and in any event, certain information requested was for printers not covered by the LOU.

Tharo filed a complaint in state court, alleging (as later amended) that cab breached the parties' contract by overcharging Tharo (the "overcharge claim") and by refusing to supply the requested "source codes" (the "failure-to-provide-information claim"). cab removed the case to federal court and filed a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, which the trial court denied.

The week before trial, cab filed a motion *in limine* seeking to preclude Tharo's expert accounting witness, Robert Brlas, from testifying. The magistrate judge, after a hearing, denied the motion, finding Brlas qualified as an expert and his testimony "relevant and reliable." The trial resulted in a jury verdict for Tharo on both claims and a total damages award of just over €6.7 million—some €1.0 million on the overcharge claim and about €5.7 million on the failure-to-provide-information claim.

Post-trial, Tharo moved to alter or amend the judgment to include prejudgment interest on the entire damages award. cab, on the other hand, moved for judgment as a matter of law or for a new trial on the failure-to-provide-information claim. Alternatively, cab moved for remittitur on this claim. The magistrate judge denied the motions for judgment as a matter of law and new trial, but ordered the damages on the failure-to-provide-information claim remitted to approximately €1.7 million, conditioned on Tharo's acceptance. Tharo later accepted, after which the magistrate judge awarded Tharo prejudgment interest on the revised damages award on both claims and then entered final judgment. cab now appeals.

No. 05-3876
*Tharo Sys. v. cab Produkttechnik*

II.


A. Personal Jurisdiction


As a threshold matter we "conduct a plenary review of [the] personal jurisdiction issue."
*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).   Tharo, as the party asserting

personal jurisdiction, "bears the burden of showing such jurisdiction exists."  *Id*.  To defeat the

motion, Tharo need only make a prima facie showing of jurisdiction.  *Id*.  And, because the trial

court ruled without conducting an evidentiary hearing, we must consider the pleadings and affidavits

in a light most favorable to Tharo (the non-moving party),  *Theunissen v. Matthews*, 935 F.2d 1454,

1458 (6th Cir. 1991), and we cannot "weigh the controverting assertions of the party seeking

dismissal."  *CompuServe*, 89 F.3d at 1262 (quotation omitted); *see also Intera Corp. v. Henderson,*
428 F.3d 605, 614 (6th Cir. 2005).


In a diversity case, a federal court can exercise personal jurisdiction over a defendant if

jurisdiction  is  "(1) authorized by the law of the state in which it sits[,] and (2) in accordance with

the Due Process Clause of the Fourteenth Amendment."  *Neogen Corp. v. Neo Gen Screening, Inc*.,

282 F.3d 883, 888 (6th Cir. 2002).


1. Ohio's Long-Arm Statute


Under Ohio's long-arm statute, "[a] court may exercise personal jurisdiction over a person

who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting

- 4 -

any business in this state." Ohio Rev. Code § 2307.382(A). The injury must also arise out of the contacts with Ohio. *Brunner v. Hampson*, 441 F.3d 457, 463 (6th Cir. 2006) (interpreting Ohio Rev. Code § 2307.382(C)).

On the strength of the Ohio Supreme Court's broad reading of the phrase "transacting any business," we agree that cab transacted business in Ohio. *See Ky. Oaks Mall Co. v. Mitchell's Formal Wear*, 559 N.E.2d 477, 480 (Ohio 1990) ("'Transact' . . . embraces in its meaning the carrying on or prosecution of business negotiations . . . and may involve business negotiations which have been either wholly or partly brought to a conclusion."). cab and Tharo carried on a business relationship in Ohio for over 15 years. Moreover, as the trial court concluded, because "the LOU was the basis of cab's transactions in Ohio, and [because] Tharo's claims are for breach of the LOU, the cause of action . . . arises from cab's transactions in Ohio." Accordingly, we agree that Ohio's long-arm statute authorizes jurisdiction over cab.

## 2. Due Process

Due process mandates that jurisdiction be exercised only if cab has sufficient "minimum contacts" with Ohio such that summoning cab to defend in Ohio would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). We use a three-part test for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.
>
> Second, the cause of action must arise from the defendant's activities there.
>
> Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1151 (6th Cir. 1990) (quotation omitted); *see S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374 (6th Cir. 1968).

1. "Purposeful Availment." The court may not exercise personal jurisdiction over cab unless cab has purposefully entered into a connection with the forum "such that [it] should reasonably anticipate being haled into court [in Ohio]." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This "ensures that [cab] will not be haled into [Ohio] solely as a result of 'random,' 'fortuitous' or 'attenuated'' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotation omitted). Though "[t]he mere existence of a contract . . . is insufficient to confer personal jurisdiction," *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000), when "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio." *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998); *see LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir. 1989) ("[W]ith respect to interstate contractual obligations . . . parties who 'reach out beyond one state and create

continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." (quotation omitted)).

Tharo made a prima facie showing that cab purposefully availed itself of the privilege of acting in Ohio. Looking at the quality and quantity of cab's contacts with Ohio we agree with the trial court that cab "consciously reached out from [Germany] to Ohio" to create an ongoing business relationship. *CompuServe*, 89 F.3d at 1266. cab frequently negotiated with Tharo through telephone calls, e-mails, and faxes directed to Ohio; cab officials visited Ohio (including a visit to finalize the LOU); the LOU envisioned a long-term partnership; the parties communicated frequently after executing the LOU, Tharo performed tasks in Ohio at cab's direction; cab shipped printers to Ohio; and cab's employees traveled to Ohio in fulfilling cab's contractual obligations.

cab, relying on *Calphalon Corp. v. Rowlette*, argues that its "contacts in Ohio with Tharo [were] . . . 'random,' 'fortuitous,' and 'attenuated," and thus Tharo failed to make a prima facie showing that cab purposefully directed its contacts to Ohio. We disagree. Calphalon was an Ohio corporation. Rowlette was a Minnesota corporation and Calphalon's exclusive representative in Minnesota. Though Rowlette sent letters and faxes and made telephone calls to Ohio (and made three trips to Calphalon's facilities there for a tour and meetings), this court held that Ohio lacked personal jurisdiction over Rowlette, *Calphalon* at 722, despite the existence of a contract. The court concluded that Rowlette's contacts with Ohio were too "fortuitous" or "attenuated" to support the exercise of jurisdiction because Rowlette's obligations under the agreement were to be performed

outside of Ohio and because Rowlette was not seeking to exploit a market for Calphalon's products in Ohio. *Id.* at 723. The court also noted that Rowlette's contacts with Ohio (by letter, telephone, fax and personal visits there) resulted not because Rowlette chose to create continuous and substantial consequences in Ohio, but because Calphalon chose to be headquartered there. *Id.*

cab's contacts with Ohio, however, were not "solely a result of Tharo's choice of location" because cab affirmatively reached out to Tharo in Ohio to negotiate the LOU in an effort to strengthen the parties' mutual business relationship. In contrast, there is no mention in *Calphalon* that Rowlette "reached out" to Ohio to negotiate with Calaphon. cab's position is comparable to the defendant's in *Burger King*. *See Burger King*, 471 U.S. at 479 (noting that where a party "deliberately '[reached] out beyond' Michigan and negotiated with a Florida corporation . . . and the manifold benefits that would derive [therefrom]. . . the 'quality and nature' of the relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated'" (citation omitted) (first alternation in original)).

2. "Arising From." If the cause of action has "a substantial connection with [cab's Ohio] activities," the "arising from" prong of the three-part test is satisfied. *S. Mach.*, 401 F.2d at 384 n.27. Put another way, the test is satisfied where "a defendant's contacts with the forum state are related to the operative facts of the controversy." *CompuServe*, 89 F.3d at 1267.

As we have already held, cab "reached out" to Ohio and created a continuing contractual obligation there. And because "the cause of action is for breach of that [obligation], . . . [it]

naturally arises from the defendant's activities in Ohio." *Cole*, 133 F.3d at 436 (citing *CompuServe*, 89 F.3d at 1267 and *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 229 (6th Cir. 1972)); *see In-Flight Devices*, 466 F.2d at 229 ("Defendant's transaction of business in Ohio -- its entering of a contractual relationship with an Ohio corporation -- is necessarily the very soil from which the action for breach grew.").

cab stresses that the "activities allegedly giving rise to Tharo's claims . . . occurred outside Ohio," and concludes that the "arising from" prong has not been satisfied. But cab's argument overlooks that the operative facts regarding the formation and meaning of the LOU, a contract negotiated and executed by Tharo in Ohio, are substantially connected with cab's Ohio activities. Given this substantial connection, it matters not that the actual breach (the overcharge and the failure to provide the source codes) may have occurred in Germany in assessing the "arising from" prong of the due process analysis. *Cf. LAK, Inc.*, 885 F.2d at 1303 (commenting that if the contract at the center of the dispute had borne a more substantial relationship to the forum, it would not have been necessary for the activities giving rise to the breach to actually have occurred in the forum).

3. "Reasonableness." Though we "consider several factors . . . , including the burden on the defendant, the interest of the forum state, [and] the plaintiff's interest in obtaining relief," *CompuServe*, 89 F.3d at 1268 (quotation omitted), in assessing the reasonableness of asserting personal jurisdiction over cab, where, as here, the first two prongs of the due process inquiry have been satisfied, we will "presume the specific assertion of personal jurisdiction was proper." *Cole*,

133 F.3d at 436 (citing *CompuServe*, 89 F.3d at 1268 and *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982)); *see S. Mach.*, 401 F.2d at 384 ("[O]nce the first two questions have been answered affirmatively, resolution of the third involves merely ferreting out the unusual cases where that interest cannot be found.").

Nothing suggests this is one of those "unusual cases." Ohio has a strong interest in resolving a suit brought by an Ohio company for breach of a multimillion dollar business agreement. Likewise, Tharo has a strong interest in obtaining relief in Ohio. We acknowledge, as did the trial court, that the "unique burdens placed upon [international defendants] should [be given] significant weight in assessing the reasonableness of [exercising long-arm jurisdiction]." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987). But "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* cab's alien status alone is insufficient to persuade us that exercising jurisdiction is unreasonable, and nothing else cab points to overcomes the presumption that the exercise of jurisdiction was proper.

Because the exercise of personal jurisdiction over cab is authorized by Ohio law and in accordance with due process, we affirm the decision to deny cab's motion to dismiss.

B. Remittitur

The jury found that cab breached the LOU by failing to deliver "full information" to Tharo, including the "source codes" for certain printers covered by the LOU. At trial, Tharo's president, Thomas Thatcher, testified that the company would lose just over €5 million in profits because of this breach. As an alternative measure, Brlas, Tharo's expert accounting witness, testified that because of the breach—that is, without the information cab was required to provide—it would cost Tharo approximately €1.7 million more to develop the technology than if it had the information. The jury awarded over €5.7 million to Tharo on this claim.[2]

Post-verdict, cab filed a "Motion for Judgment as a Matter of Law, New Trial, or in the alternative, Remittitur." In requesting remittitur, cab pointed out that a court should order a remittitur if the jury's verdict is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (quotation omitted). cab further stressed that remittitur is "particularly appropriate where damages estimates offered by a witness are too speculative to support a jury's damages award," and concluded by arguing that "the evidence does not support either of Tharo's alternative theories of damages on [the failure-to-provide-information claim]. . . . [T]his Court should reduce the damages by ordering a remittitur." As cab explained in its reply brief, "the trial court could have entered judgment in cab's favor on [this claim], granted a new trial, or in the alternative, found that [the claim] was not supported by any damages and remitted [the award] to zero."

---

[2]It is unclear how the jury arrived at this final amount—an amount that exceeds either of the two alternative measures submitted by Tharo.

The magistrate judge agreed that Thatcher's lost profits testimony was too speculative to support the damages award with reasonable certainty and also agreed that the jury's award exceeded "the maximum that . . . could reasonably . . . be compensatory." Then, after noting there was "ample evidence of the developmental costs estimation of damages [as provided by Brlas's testimony]" the magistrate judge (conditionally) remitted Tharo's damages on the failure-to-provide-information claim to approximately €1.7 million, which Tharo accepted. cab now argues that after finding Thatcher's lost profits testimony too speculative to support the jury's award, "the trial court should have *ordered a new trial* on Tharo's . . . damages for developmental costs." (Emphasis added.) We find that the invited-error doctrine precludes cab's challenge.

Under the invited-error doctrine, "a party may not complain on appeal of errors that he himself invited or provoked the court . . . to commit." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 354 (6th Cir. 2002) (quotation omitted) (alteration in original). The magistrate judge granted cab's motion for remittitur; yet it is cab that "now cries foul on appeal," complaining that the case should have been remanded for a new trial on the damages issue. Because it was cab that presented the trial court with the option of granting the motion for remittitur as an alternative to ordering a new trial, cab cannot argue on appeal that the trial court erred by ordering a remittitur *in place of* a new trial, even if cab is not satisfied with the amount of the remittitur.

cab contends on appeal that because it asked the trial court to remit the damages award to zero and because it was actually Tharo "that specifically invited the trial court to . . . remit the . .

. judgment to [€1.7 million]," the invited-error doctrine is inapplicable. But given that cab assigns error to the magistrate judge's failure to order a new trial, it is irrelevant which party first suggested the €1.7 million figure. cab initially requested remittitur, and cab now argues the magistrate judge erred by ordering remittitur instead of a new trial. Under these circumstances, we find that the invited-error doctrine bars cab's appellate challenge.

## C. Expert Testimony

cab next argues that the trial court failed to carry out its gatekeeping responsibilities and erroneously permitted Brlas to testify as an expert. In his testimony, Brlas opined on the amount of damages Tharo suffered from cab's breach. He estimated the amount cab overcharged Tharo, and he estimated the value to Tharo of the technological information that cab failed to provide.

We review de novo whether the trial court abdicated its gatekeeping role. *See Bureau v. State Farm Fire & Cas. Co.*, 129 Fed. Appx. 972, 975 (6th Cir. 2005) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) and *Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1087-88 (10th Cir. 2000)). But we review the trial court's decision to admit expert testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), as well as any decisions regarding how to determine the admissibility of the evidence, for an abuse of discretion. *See Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).

Admissibility of expert testimony is governed primarily by Fed. R. Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert*, the Supreme Court provided guidance for the application of Rule 702, explaining that

trial courts, as "gatekeepers," must determine

whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592-93.  Accordingly, a trial court must ensure an expert is qualified and that

his proffered testimony is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589 (footnote

omitted).[3]

The trial court here fulfilled its gatekeeping role.  In response to cab's motion to preclude

Brlas's testimony, filed just six days before he was scheduled to testify,  the magistrate judge (after

allowing cab the opportunity to supplement its motion) reviewed the parties' briefing, held a

*Daubert* hearing, and concluded:

I've heard the arguments and we've had the evidentiary hearing in this case.  It's my finding that Mr. Brlas is both qualified as an expert to testify on the matters for

---

[3]The Supreme Court has held that "*Daubert*'s general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on . . . 'other specialized' knowledge." *Kumho Tire,* 526 U.S. at 141; *see also First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001).

- 14 -

which he's offered, and that under the *Daubert* analysis and [*Kumho*] *Tire* analysis that his testimony is also relevant and reliable, and therefore, his testimony would be admissible. It seems to be that the arguments that have been made by [cab] go to the weight and credibility to be given to his testimony, not to the underlying issues of his qualifications and methodology. I find that the methodology he used is acceptable and is accepted in the field.

cab challenged this ruling in its post-verdict motion and the trial court reaffirmed its holding, explaining that

Mr. Brlas has been a certified public accountant (CPA) since 1981 and is a partner at BBB [P]artners, where he specializes in financial analysis and business disputes. . . . This Court has no doubt that an expert opinion on the value of certain technology is relevant to the amount of damages resulting from failing to deliver [the requested information]. . . . Mr. Brlas utilized a methodology called "benchmarking" to estimate the cost to develop the technology at issue. . . . Mr. Brlas testified, without rebuttal, that benchmarking is recognized in his profession as a method to estimate cost and value; and he cited a cost accounting text book that referenced this methodology. Based on all the foregoing, this Court reaffirms its prior finding that Mr. Brlas's testimony was admissible under *Daubert.*

The trial court's analysis sufficiently establishes that it did not abdicate its gatekeeping role. *Cf. McGregor v. Paul Revere Life Ins. Co.*, 92 Fed. Appx. 412, 420 (9th Cir. 2004) ("While the trial judge's findings here were brief, they were sufficient to establish that she did not abdicate her gatekeeping role.").

Although cab argues that the trial court "merely [went] through the motions of having a hearing and briefing process," we cannot agree. cab cites cases holding that a trial court does not fulfill its gatekeeping responsibilities where it "fails to consider an essential *Daubert* factor, such

as reliability," *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 608 (7th Cir. 2006), or where there is "not a single explicit statement on the record [indicating] that trial court conducted any form of *Daubert* analysis whatsoever," *Goebel,* 215 F.3d at 1088. But as explained above, that is not this case—nothing suggests that the trial court overlooked any of the *Daubert* factors.

We also reject cab's argument that the trial court abused its discretion in finding Brlas qualified to testify as an expert and in finding his testimony both reliable and relevant. A witness must qualify as "an expert by knowledge, skill, experience, training or education." Fed. R. Evid. 702. A witness is not "an expert simply because he claims to be." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (quotation omitted). Brlas is a certified public accountant who has testified in nearly 100 trials and worked as an auditor at an international accounting firm. cab believes he is not an expert because "[t]here is no evidence [he] is familiar with German accounting principles." Yet cab offers nothing to rebut Brlas's testimony that there are no material "differences between cab's German financial statement and [the] typical U.S. financial statements" he regularly encounters. Moreover, to the extent that Brlas "may have lacked familiarity with some aspects of [German accounting], . . . such unfamiliarity merely affected the weight and credibility of his testimony, not its admissibility." *First Tenn. Bank*, 268 F.3d at 333.

With respect to reliability, cab contends that because Brlas mistranslated a word in cab's financial statements, his overcharge claim-related testimony was not reliable. Under cab's translation, 80% of the salaries under the heading "Gehalter," should have been included in the

production costs that Tharo was to pay cab. cab argues that Brlas's mistranslation caused him to exclude 100% of the salaries from his calculations, leading to an inflated damages estimate. cab does not, however, challenge the underlying method Brlas used to determine the amount of the overcharges. On cross-examination cab asked Brlas if his "production-related analysis" was too narrow, and Brlas admitted it was "possible" that he "pulled out" too many salaries. Additionally, cab's accountant testified that 80-85% of the "gehalter" salaries should have been included. Regardless of which translation is correct, the debate over whether to include these salaries is a fact question—one the jury resolved against cab—that does not render Brlas's testimony unreliable.

With respect to the failure-to-provide-information claim, cab again contends that Brlas did not qualify as an expert because he had "no technical expertise on the [research and] development of thermal transfer printers" and therefore "could not offer a reliable method for estimating development costs." But cab does not challenge the magistrate judge's finding that Brlas, a CPA specializing in financial analysis and business disputes, was qualified "to opine on the value of technology," with or without "technical expertise" in the field of thermal transfer printers.

cab also challenges the reliability of Brlas's testimony relating to the failure-to-provide-information claim. Relying on cab's available financial documents, Brlas estimated the cost of developing the technology using the "benchmarking" method. The magistrate judge summarized benchmarking as: a "method that utilizes ratios to estimate cost or value in situations where incomplete historical data exists." Brlas testified that benchmarking is "a recognized method to

determine things like cost and value," which requires "accountants to use their best judgment in coming up with estimates." cab attacks the result Brlas reached but fails to demonstrate the unreliability of Brlas's valuation. Moreover, though cab points out that Brlas admitted he had never before used benchmarking to estimate the value of technical information, cab does not argue that the method itself is unreliable. cab was free to, and did, rigorously cross-examine Brlas in an effort to cast doubt on his testimony. The verdict reflects that the jury credited Brlas's opinion. We find no abuse of discretion in admitting it.

Finally, cab argues that even if benchmarking could properly be used to determine its past developmental costs, it "had no relevance to the issue of correlating cab's past costs to Tharo's future costs." As the magistrate judge explained, however, benchmarking uses historical data (such as the cost of developing a product in the past) as a guide for estimating the cost of developing similar products in the present—the very purpose of using the method is to estimate present costs based on past costs. Brlas needed to estimate Tharo's developmental costs because there was insufficient data to do anything more.[4]

---

[4]cab also contends that Brlas could not determine cab's past development costs because he did not have all the necessary financial information. Tharo responds that to the extent Brlas relied on incomplete data it is because "cab did not retain any records of its [past] developmental costs." *Cf. Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("Both experts noted that their analysis was hampered by the lack of records, . . . and it seems patently unfair to allow [the party seeking to exclude the experts testimony] to benefit from what seems to be a deplorable, and perhaps even negligent, absence of record-keeping."). cab fails to respond to Tharo's argument.

For these reasons we find that the trial court did not abuse its discretion in admitting Brlas's testimony. Our conclusion obviates cab's request that "the panel *sua sponte* enter judgment in its favor" on both claims

D. Prejudgment Interest

Tharo moved to alter or amend the judgment, pursuant to Fed. R. Civ. P. 59, asking for prejudgment interest on its entire damages award. The magistrate judge awarded prejudgment interest, a decision we review for an abuse of discretion. *Clay v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir. 2000). Whether the trial court had the authority to grant prejudgment interest, however, is a question of state law. *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). Because we are sitting in diversity, we "must follow the controlling decisions of the Ohio Supreme Court" on questions of Ohio state law. *Henry v. Wausau Bus. Ins. Co.*, 351 F.3d 710, 713 (6th Cir. 2003) (citations omitted).

1. Prejudgment Interest on the Failure-to-Provide-Information Claim

Ohio Revised Code § 1343.03(A) governs a trial court's authority to award prejudgment interest on a breach of contract claim. It provides, in part, that a creditor is entitled to interest at the statutory rate "when money becomes due and payable upon any . . . instrument of writing, . . . and upon all judgments . . . for the payment of money arising out of . . . a contract." cab argues Tharo's claims fall outside the scope of the statute because no money is "due and payable" to Tharo under

the terms of the contract. That is, as alleged in the complaint, the LOU required cab to furnish the requested information, which cab failed to do; but the LOU did not require cab to make any payments to Tharo. Ohio law, however, does not support cab's position.

In *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 652 N.E.2d 687 (Ohio 1995), the Supreme Court of Ohio found that The Ohio State University breached a construction contract. The court held that "to make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment." *Id.* at 692. Thus, "in a case involving a breach of contract where liability is determined and damages are awarded . . . , the aggrieved party is entitled to prejudgment interest." *Id.*

Relying on this reasoning, Ohio courts (and this court) have held that the "language [of Ohio Rev. Code §1343.03(A)] is not permissive nor ambiguous," *Dwyer Elec. v. Confederated Builders*, No. 3-98-18, 1998, Ohio App. LEXIS 5490, at *8 (Ohio Ct. App. Oct. 29,1998)—"once a party has a judgment for an underlying contract claim . . . he is entitled to judgment as a matter of law." *Id.* at *5; *see also Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 693 (6th Cir. 2000) (noting, in summarizing Ohio-prejudgment interest law, that "[i]f a favorable judgment award has been obtained by plaintiff, plaintiff has a right under [Ohio Rev. Code §]1343.03(A) to an interest award as a matter of law, and the trial judge has no discretion not to grant any interest award"); *Local Mktg. Corp. v. Prudential Ins. Co. of Am.*, 824 N.E.2d 122, 126 (Ohio Ct. App. 2004) (rejecting an argument similar to cab's as "ignor[ing] the statutory language that says that

interest is appropriate under a judgment arising out of a contract"); *Dayton Sec. Assocs. v. Avutu*, 664 N.E.2d 954, 959 (Ohio Ct. App. 1995) ("[Section] 1343.03(A) reposes no discretion in the trial court. . . . When the liability issue was determined in the Plaintiffs' favor, they were then entitled to prejudgment interest pursuant to the statute.").

cab points the court to a recent Ohio appellate court decision, *RPM, Inc. v. Oatey Co.*, Nos. 3282-M, 3289-M , 2005 Ohio App. LEXIS 1251 (Ohio Ct. App. Mar. 23, 2005), in which the court declined to award prejudgment interest for breach of a confidentiality agreement, holding that by the "explicit terms of [the statute], prejudgment interest is limited to those contracts that provide for a payment of money that the breaching party failed to pay." *Id*. at *38. *RPM* distinguished *Royal Electric* on the ground that in that case there was no question that "there was in fact money owed under the . . . terms of [the] contract"; rather, the "sole dispute" was over "whether [the plaintiff] was entitled to . . . prejudgment interest . . . despite the fact that the amount of the debt was . . . not reasonably capable of ascertainment." *Id.* at *39-40. But as the dissent commented (and as the weight of the authority suggests), "the net effect of the *Royal Electric* ruling is that prejudgment interest is appropriate in contract claims. . . . Because of what was verbalized in [the contract], money became due and payable when [the defendant] did what it did." *Id*. at *43-44. That is, money damages become due and payable on a contract at the time of the breach.

Alternatively, cab argues that "Tharo is still not entitled to . . . prejudgment interest on the development costs because that money has never actually been spent." But whether Tharo spent the

money to develop the technology matters not because, as Tharo explains, the €1.7 million damages award represented the cost to recoup the property the contract promised but cab wrongfully withheld from Tharo as of the date of the breach. Because Tharo presented evidence of its development costs as a proxy for future lost profits, cab argues that "Tharo itself recognized development costs are future damages." But cab offers nothing to suggest that Tharo's estimates did not represent the present value of the breach, nor did it offer any such suggestion at trial.

We discern no abuse of discretion and affirm the decision to award prejudgment interest on the failure-to-provide-information claim damages.

### 2. Prejudgment Interest the Overcharge Claim

The jury found that cab breached the LOU by overcharging Tharo and awarded Tharo just over €1 million in damages. In addition to re-asserting its "no-money-due-and-payable" argument against allowing prejudgment interest, cab also argues that Tharo is not entitled to prejudgment interest because "Tharo did not lose the value of its money." cab contends that the overcharge damages were merely meant to allow Tharo to recover the overpayments it made to cab. The Supreme Court of Ohio, however, has squarely rejected this argument. *See Miller v. Gunckle*, 775 N.E.2d 475, 480-81 (Ohio 2002) ("[I]nterest is allowed, not only on account of the loss which a creditor may be supposed to have sustained by being deprived of the use of his money, but on account of the gain made from its use by the debtor." (quotation omitted)). Tharo had no

responsibility to explain what it would have done with the money had it not wrongfully overpaid cab.

Accordingly, we affirm the decision to award prejudgment interest. But inasmuch as the parties agree that the magistrate judge used an incorrect date in determining when prejudgment interest stopped accruing on the overcharge claim, we remand the case for the limited purpose of determining the correct end date and recalculating the *amount* of prejudgment interest Tharo is entitled to on this claim.

### E. Present-Value Instruction

cab contends that the trial court erred by not instructing the jury to reduce Tharo's damages on the failure-to-provide-information claim to present value. cab failed to object to the lack of the instruction at trial, thus we review only for plain error. *See Preferred RX v. Am. Prescription Plan*, 46 F.3d 535, 548 (6th Cir. 1995); Fed. R. Civ. P. 51(d)(2).

"Under the common law of Ohio, future damages must be reduced to present value, and a defendant is entitled to a jury instruction to that effect." *Galayda v. Lake Hosp. Sys.*, 644 N.E.2d 298, 301 (Ohio 1994). But, as we discuss above, the damages on the failure-to-provide-information claim represent "the value of the information cab was required to turn over to Tharo" on the date of the breach, and at trial cab failed to challenge the accuracy of €1.7 million estimate. Nevertheless, cab asks this court to speculate that Brlas's estimate did not reflect the value at the time of the

breach and to conclude that the trial court plainly erred by not instructing the jury to reduce its damages award accordingly. We decline to engage in such speculation.[5]

## F. Parol Evidence

Post-trial, the magistrate judge denied cab's Fed. R. Civ. P. 50(b) for judgment as a matter of law on the failure-to-provide-information claim. On appeal, cab argues that the LOU's unambiguous terms mandated judgment as a matter of law in its favor, and the trial court improperly allowed parol evidence. Assuming the trial court erroneously admitted the disputed evidence, we nonetheless affirm the trial court's denial of cab's 50(b) motion because cab failed to renew its motion for judgment as a matter of law at the close of all evidence.

"'It is well-settled that a court can . . . consider a [post-trial] motion for a [judgment as a matter of law] *only if* the moving party has previously made a motion for [judgment as a matter of law] at the close of all the evidence." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 447-48 (6th Cir. 2005) (quoting *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1522 (6th Cir. 1990) (footnote omitted). cab moved for judgment as a matter of law at the conclusion of the Tharo's case but failed to renew its motion at the close of all evidence. Although "technical deviation from [this procedural] command is not fatal," *Medshares Mgmt.*, 400

---

[5]In the order denying cab's post-judgment motions, the magistrate judge noted that "[i]f Tharo chooses to go forward with a new trial [on damages], Tharo must come forward with evidence of present value." This does not, however, affect our analysis. If Tharo had been required at trial to come forward with "evidence of present value," presumably it would have explained, as it does now, that the evidence presented at trial already estimated the present value of the breach.

F.3d at 448 (quotation omitted), cab makes no argument that an exception applies. *See id.* (listing

exceptions to the rule). We affirm the denial of the motion.[6]

III.

For these reasons, the court remands the case to allow the magistrate judge to determine the

date prejudgment interest stopped accruing on the overcharge claim. Accordingly, the court also

remands the case to properly recalculate the amount of prejudgment interest Tharo is entitled to on

the overcharge claim. We affirm the trial court in all other respects.

---

[6]Though the magistrate judge denied cab's motion on the merits, we may affirm that decision "if correct for any reason, including one not considered below." *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238 (6th Cir. 2004) (quotation omitted).